# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 00-94 |
| DAVID FIGUEROA, | : | |
| Defendant. | : | |
| | : | |

## Memorandum and Order

YOHN, J.                                                                December ____, 2008

On June 14, 2000, a jury found defendant David Figueroa guilty of possessing heroin
with intent to distribute in violation of 21 U.S.C. § 841(a)(1), carrying a firearm during and in
relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c), and possessing a firearm
having previously been convicted of a felony in violation of 18 U.S.C. § 922(g)(1).  Defendant
has filed a motion for a new trial under Federal Rule of Criminal Procedure 33 in light of newly
discovered evidence supporting his innocence.  The newly discovered evidence is the testimony
of Frank Justiniano confessing that he framed defendant by planting the heroin and revolver in
defendant's car that resulted in defendant's conviction.  After a review of all the testimony at the
hearing on this motion, the complete transcript of the trial and the briefs of counsel, I concluded
that Justiniano's testimony met the requirements of Rule 33.  Therefore, I granted defendant's
motion for a new trial on July 30, 2008.

On August 14, 2008, the Third Circuit filed its opinion in *United States v. Kelly*, 539 F.3d
172 (3d Cir. 2008) clarifying the analysis to be applied to a motion for a new trial.  In particular,

it set forth the analysis for the fifth factor to be considered, i.e., whether the new evidence is

"such and of such nature, as that, on a new trial, the newly discovered evidence would probably

produce an acquittal."  Previously district courts had to rely primarily on authority from other

circuits or district courts of this circuit and their methodology in analyzing this factor.  As a result

of the *Kelly* decision, I suggested to the parties that a motion for reconsideration be filed to

enable reconsideration of the facts and law under the clarified method of analysis.  The

government filed its motion for reconsideration and brief on August 28, 2008 and the defendant

filed a reply on September 15, 2008.  After further review of the trial transcript, an evidentiary

hearing on November 1, 2007 and the briefs of counsel, and no further evidence being proffered,

I will grant the motion for reconsideration due to the intervening change in the law, vacate the

memorandum and order dated July 30, 2008, but, on reconsideration, grant the defendant's

motion for a new trial.

I.       **FACTUAL BACKGROUND**[1]

On October 30, 1999, Police Officer Ronald Dove heard gunshots and drove toward the

noise.  En route, Officer Dove received a radio report stating that a man with a gun was seen

driving a blue, two-door 1984 Mercury Cougar with a Pennsylvania license plate number of

---

[1] The parties agree at this stage that the only issue before the court is whether Justiniano's testimony would probably produce an acquittal in the new trial.  The court ruled on December 9, 2008, after the evidentiary hearing and oral argument that the facts alleged caused it to infer diligence on the part of the defendant under the *Kelly* standard.  The government concedes the other Rule 33 factors except for the probability of an acquittal.  The court will, therefore, limit its recitation of facts to those relevant to his testimony.  Additional factual findings are available in the court's Memorandum and Order dated September 18, 2000, wherein I denied defendant's motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  *See United States v. Figueroa*, No. 00-94, 2000 U.S. Dist. LEXIS 13344 (E.D. Pa. Sept. 18, 2000).

4201415.  Shortly thereafter, Officer Dove drove by a parked Mercury Cougar fitting the description of the radio report.  He observed defendant standing outside the parked car, but defendant subsequently entered the car and began driving.  Officer Dove followed defendant and observed him make a left turn without signaling.  Officer Dove then pulled defendant over.  As Officer Dove approached the car, he saw defendant bend forward in the driver's seat.  Officer Dove asked defendant to step out of the car.  As defendant stepped out of the car, Officer Dove noticed the butt of a gun sticking out from underneath the driver's seat in plain view.  He handcuffed defendant, and backup police officers moved defendant into a patrol car.

After recovering the gun, Officer Dove determined that it was a pellet gun.  During direct examination at trial, Officer Dove testified that he then looked farther underneath the driver's seat and saw a newspaper-wrapped package (later determined to contain 2.4 grams of heroin in six bundles with twelve to thirteen packets bundle for a total of seventy-eight packets) and a .22-caliber revolver.  (Trial Tr. 36:21-37:6, June 12, 2000 (hereinafter June 12 Tr.).)  On cross-examination, Officer Dove admitted that he could not see anything when he looked under the front of the driver's seat, so he instead "went to the rear of it to look underneath it."  (*Id.* at 63:8-21, 64:14-65:5.)  He had to retract the driver's seat to access the rear of the two-door vehicle, after which he recovered the revolver and package of heroin by pulling them from under the rear of the driver's seat.  (*Id.* at 65:6-24.)  The police did not fingerprint the .22 caliber revolver or the heroin package, so there was no physical evidence that defendant handled them.  (*E.g.*, Trial Tr. 20:17-21:21, June 13, 2000 (hereinafter June 13 Tr.); *id.* at 172:2:-173:8.)

On February 23, 2000, defendant was indicted for:  (1) possessing a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1); (2) carrying a firearm during and in

relation to the drug trafficking crime in violation of 18 U.S.C. § 924(c); and (3) possessing a firearm having previously been convicted of a felony in violation of 18 U.S.C. § 922(g)(1). The firearm alleged was the .22 caliber revolver. At trial, defendant admitted that he owned the pellet gun but claimed that neither the heroin nor the revolver belonged to him. (*E.g.*, June 13 Tr. 119:14-123:5.) Defendant maintained that he was not aware that either the revolver or the heroin was in the car. (*E.g.*, *id.* at 148:9-150:1.)

Defendant further stated that on the day in question, he had a stereo system installed in the car. (*Id.* at 110:13-111:19.) After returning home at about 7:00 p.m., he left the car unlocked, with the windows down, on a corner of the block on which he resides. (*Id.* at 115:6-119:4.) A number of people gathered around and sat inside the car to listen to the newly installed stereo system. (*Id.*) Defendant testified that in the evening, he was wrongly accused by a drug dealer named Jose[2] of "gagging," which defendant defined as taking money from drug customers without providing drugs to them. (*Id.* at 126:7-127:16, 128:20-130:10.) Jose demanded that defendant leave the area, and as a result of this accusation, defendant and Jose wrestled to the ground. (*Id.* at 130:12-133:9.) After Jose released defendant, defendant went for a walk to cool down, during which time his car was left unlocked and unattended. (*Id.* at 133:21-135:118.) Defendant testified that, when he returned to his car, an individual named Will was in his car, and Jose and others were nearby. (*Id.* at 138:7-140:18.) During closing argument, defendant's counsel argued that a drug dealer selling drugs on defendant's street likely used defendant's car to store the drugs without defendant's knowledge or that drug dealers framed defendant because

---

[2] Defendant testified that Jose was also known as "Shep" but he did not know Jose's full name. (June 13 Tr. 128:24-25.)

4

they thought he was "gagging" their potential drug customers.  (*Id.* at 211:9-214:3.)  In response, the government urged the jury to infer constructive possession of the .22 caliber revolver and the heroin.  (*Id.* at 189:7-9, 189:21-191:3, 198:3-13, 221:3-222:8.).  The court instructed the jury on the elements of constructive possession.  (*E.g.*, Trial Tr. 24:15-25:22, June 14, 2000 (hereinafter June 14 Tr.).)

The jury found defendant guilty of all three counts on June 14, 2000.  Thereafter, defendant filed a motion for a judgment of acquittal under Rule 29.  Defendant argued that there was insufficient evidence to support an inference that he knew of the contraband's presence in the car.  The court denied the motion.  The court concluded that the evidence—including the contraband's proximity to defendant's position in the driver's seat, defendant's bending forward in the driver's seat prior to the search, and the discovery of the pellet gun partially concealed beneath the driver's seat—supported a reasonable juror's inference that defendant knew of the contraband's presence in the car.  *Figueroa*, 2000 U.S. Dist. LEXIS 13344, at *8-14.  The court sentenced defendant to 252 months of imprisonment and three years of supervised release.  Defendant appealed, and the Third Circuit affirmed both his conviction and sentence on December 18, 2001.  The Supreme Court denied defendant's petition for a writ of certiorari on April 22, 2002.

On August 7, 2006, defendant filed the instant motion for a new trial under Rule 33 in light of newly discovered evidence supporting his innocence.  (Def.'s Mot. New Trial 1-5.) Defendant asserted that on March 8, 2006, Frank Justiniano, an inmate at the Federal Correctional Institution in Fairton, New Jersey, spoke with defendant's counsel over the phone and confessed that he had framed defendant by planting the revolver and heroin in defendant's

5

car.  (*Id.* at 4.)  Defendant's counsel acquired Justiniano's affidavit on June 23, 2006 and

submitted it with the motion.  (*Id.*)

In the affidavit, Justiniano states he was a member of a drug gang led by Santos Mendez.[3]

(Justiniano Aff. ¶ 1.)  Justiniano states that he successfully persuaded Mendez, who was angered

because he thought defendant was "gagging" in the gang's territory, not to kill defendant.  (*Id.*)

Instead, Mendez agreed to frame defendant by placing a gun and drugs in his car, and then by

placing an anonymous call to the police.  (*Id.*)  Justiniano claims to have participated in carrying

out Mendez's plan by placing "six bundles of heroin and a loaded .22 caliber revolver . . . under

the rear seat behind the driver's side" between midnight and 1:00 a.m. on October 30, 1999.  (*Id.*)

In addition, he claims to have heard Mendez anonymously calling the police to report a man with

a gun driving a Mercury Cougar fitting the description of defendant's car.  (*Id.*)  Justiniano states

that he did not confess to framing defendant earlier because he feared that Mendez would have

him killed and that he would be criminally punished for participating in the framing.  (*Id.* ¶ 2.)

Based on this affidavit, defendant filed his motion for a new trial under Rule 33.

The government initially opposed the motion by arguing that it was untimely under Rule

33.  The government contended that Federal Rule of Criminal Procedure Rule 45(b)(1)(B), which

allows a court to reach the merits of an untimely motion if excusable neglect caused the

---

[3]All members of Mendez's drug gang, including Justiniano and Mendez, were arrested
and convicted in this District on charges related to drug trafficking.  *See United States v. Mendez*,
Nos. 03-cr-87 & 88 (E.D. Pa.).  On December 13, 2005, Mendez was sentenced to imprisonment
for life.  *See id.* 03-cr-87-1 & 88-1.  Justiniano was sentenced to a total of 120 months of
imprisonment and ten years of supervised release, although his sentence was reduced on June 3,
2007 to a total of 101 months of imprisonment pursuant to the retroactive application of the
revised sentencing guidelines for crack cocaine sentences.  *See United States v. Justiniano*,
Order, Nos. 03-cr-87-2 & 88-4 (E.D. Pa. June 3, 2008).

untimeliness, is inapplicable to Rule 33(b)(1).  On August 15, 2007, I concluded that Rule

45(b)(1)(B) applies to Rule 33 and ordered an evidentiary hearing to determine whether

defendant met the excusable neglect standard of Rule 45(b)(1)(B), and, if so, whether defendant

was entitled to a new trial based on Justiniano's statement under the standards of Rule 33(a).  *See*

*United States v. Figueroa*, No. 00-94, 2007 WL 2345283, at *5-6 (E.D. Pa. Aug. 15, 2007).  The

evidentiary hearing was held on November 1, 2007, and the court heard oral argument on

November 14, 2007.

     During the November 1, 2007 hearing, the court heard testimony from Luciano Figueroa,

Frank Justiniano, Jose Carrasquillo, Daniel Rivera, and David Kozlow.[4]  Justiniano's testimony

is most relevant to the present issue—whether his testimony would probably produce an acquittal

in a new trial.[5]  Justiniano testified that he was part of Santos Mendez's drug organization.

Mendez and Justiniano suspected that Figueroa was "gagging" their drug customers.  (Hr'g Tr.

61:16-62:9, Nov. 1, 2007 (hereinafter Nov. 1 Tr.).)  Because of this, Mendez wanted to kill

Figueroa, but Justiniano persuaded Mendez to frame Figueroa instead.[6]  (*Id.* at 62:10-63:25.)

---

[4] As discussed in my ruling from the bench on November 14, 2007, Luciano's, Carrasquillo's, and Kozlow's testimonies were primarily relevant to the issue of excusable neglect under Rule 45(b)(1)(B) and whether defendant met the newly discoverable evidence and reasonable diligence requirements of Rule 33.

[5] Justiniano came forward after he was sentenced for his other crimes and after the five-year statute of limitations for planting the drugs had expired.  He testified, however, that he was unaware of the statute of limitations when he first confessed to planting the drugs.  (*See id.* at 148:2-149:23).  He was instead motivated to help defendant.  (*Id.* at 148:12-16.)

[6] In the past, Mendez had members of his gang kill or attempt to kill individuals he suspected of gagging within the territory of his drug distribution operation.  For example, Rivera testified that Mendez's conviction for homicide resulted from a murder he ordered because the victim was gagging his customers.  (*Id.* at 188:14-189:6.)  Likewise, Rivera testified that he too was gagging Mendez's customers and Mendez's response was to have Rivera shot five times in

Justiniano believed this was a better alternative to killing Figueroa because Mendez was already

being investigated for murder, and Justiniano "didn't want [Mendez] catching another body."

(*Id.*)  Mendez and Justiniano decided to plant drugs and a gun inside Figueroa's car.  (*Id.*)

According to Justiniano, late on October 29, 1999, or early in the morning of October 30,

1999, Mendez gave Justiniano a loaded .22 revolver and heroin.  (*Id.* at 64:10-65:4, 100:16-

101:14.)  The heroin was "wrapped up in newspaper, like, thirteen, fourteen bundles of it."[7]  (*Id.*

64:16-4, 100:16-101:4.)  Justiniano admitted that on the night of October 29, 1999 or early

morning of October 30, 1999, he planted the revolver and heroin in Figueroa's "blue Cougar."

(*Id.* at 65:5-66:19.)  Mendez kept watch while Justiniano broke into defendant's car and hid the

contraband.[8]  (*Id.* at 66:8-14.)  Justiniano used a filed-down key to unlock the car.  (*Id.* at 154:5-

15.)  He planted the newspaper-wrapped heroin and revolver "[i]n back of the driver's seat in the

bottom."[9]  (*Id.* at 153:14-18.)  He testified that they were not visible from outside of the car and

the back.  (*Id.* at 168:15-169:4.)

[7] This testimony was inconsistent with Justiniano's affidavit in which he stated that there were six bundles.

[8] As described above, at significant times on October 30, 1999, defendant's car was unlocked.  At trial, however, defendant testified that he locked his car doors at night, "when I go to sleep" (June 13 Tr. 166:3-6), consistent with Justiniano's description that he broke into defendant's car at night.

[9] This answer was in response to the court's questioning of Justiniano to clarify testimony about the location of the drugs.  Earlier in the hearing, Justiniano testified that "[i]t's not under the driver's seat, it's in the back passenger seat."  He stated that he placed them "[b]ehind the driver's side in the back seat, the part that you sit at" and "in the back seat . . . behind the driver's side."  (Nov. 1 Tr. 65:22-66:6.)  However, in response to the prosecutor's question "[w]ere you worried at all about what Mr. Mendez would have thought if Mr. Figueroa would have looked under his seat for something and discovered the gun and drugs?," Justiniano responded "No," suggesting they were under Figueroa's driver's seat.  (*Id.* at 100:7-10.)

that he hid them so that Figueroa would not discover them.  (*Id.* at 154:2-4.)  During the day on October 30, 1999, Mendez, and at least one other person, on Mendez's order, placed calls to the police to report Figueroa's possession of a weapon.  (*Id.* at 66:20-67:3, 151:23-153:10, 156:5-157:12, 162:24-164:4.)  Justiniano witnessed one of the calls in the early afternoon, between noon and 3:00 p.m.  (*Id.* at 66:18-67:37, 98:10-99:10.)  David Kozlow, defendant's counsel, testified that the CAD report of the Philadelphia Police Department shows a telephone call was received at 11:29 p.m. on October 30, 1999.  Kozlow obtained the CAD report during the course of his original investigation.  Unfortunately, the Philadelphia police radio room at that time did not have the ability to trace cell phone numbers so that he was unable to learn the origination of the call.  The CAD information obtained is with reference to the one call related to the criminal complaint in this action.  Any other previous calls would not have been recovered since they would not have been traced by the criminal complaint number as this CAD was.

The government cross examined Justiniano on the substance of his factual testimony regarding the set up of Figueroa, his potential biases, including his desire to make good with the community before being released in 2011 (*see id.* at 146:7-147:25), and about his delay in coming forward with his testimony until after the statute of limitations expired (*see id.* at 148:2-149:17).

At the end of the November 14, 2007 hearing, I ruled that the motion for a new trial under Rule 33(a) filed on August 7, 2006 was timely because of excusable neglect under Rule 45(b)(1)(B), for the reasons set forth on the record.  (Hr'g Tr. 39:10-39:22, Nov. 14, 2007 (hereinafter Nov. 14 Tr.).)  I also held that Justiniano's testimony was not discovered by defendant until after trial and that defendant was diligent in promptly bringing the newly

9

discovered evidence to the court's attention.  (*Id.* at 39:10-39:22.)  I had previously held, in the November 1 hearing, that Justiniano's testimony was not cumulative or impeaching and was material to the issues involved.  (Nov. 1 Tr. at 262:20-22.)  Thus, at the end of the November 14 hearing, I order briefing on the sole remaining issue—whether the new evidence would probably produce an acquittal at trial.  (Nov. 14 Tr. 39:23-40:8.)  Both parties submitted briefs addressing this issue.  On July 30, 2008, I issued a memorandum and order granting the motion for a new trial.

On August 14, 2008, the Third Circuit filed the *Kelly* opinion.

The *Kelly* court noted that *Iannelli's* fifth prong has "caused some confusion in our district courts" and therefore discussed the factor "so as to provide clarity to this area of the law."

The *Kelly* court quoted, with approval, the language in *United States v. Grey Bear*, 116 F.3rd 349, 350 (8th Cir. 1997) stating "it is the job of the district court, either on affidavits or after an evidentiary hearing . . . to decide whether the newly discovered evidence is credible, and, if so, whether it would probably produce an acquittal if a new trial were held."

The court then followed *U.S. v. McCullough*, 457 F.3d 1150 (10th Cir. 2006) which stated that "the district court is to serve as a gatekeeper to a new trial, deciding in the first instance whether the defendant's proffered 'new evidence' is credible."

Next, the *Kelly* court directed the district court to focus on whether a jury probably would reach a different result upon hearing the new evidence.  The district court must weigh the testimony against all of the other evidence in the record, including the evidence already weighed and considered by the jury in the defendant's first trial.

Pursuant to the *Kelly* opinion, I suggested to the parties that they file a motion for reconsideration, which the government did.  Both parties briefed the issue and I reviewed the briefs, the trial transcript and the transcript of the evidentiary hearing under the clarified *Kelly* standard.  I will now grant the motion for reconsideration, vacate my July 30, 2008 memorandum and opinion in order to analyze the issue under the clarified standard and, upon doing so, grant the motion for a new trial.

## II.   DISCUSSION

### A.   Standard

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  For a motion based on "newly discovered evidence, the court may grant a new trial if five requirements are met:

> (a) the evidence must be in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006) (citing, e.g., *United States v. Iannelli*, 528 F.2d 1290, 1292 (3d Cir. 1976)).  The decision to grant or deny a motion for a new trial lies within the discretion of the district court, *id.* (citing *Gov't of V.I. v. Lima*, 774 F.2d 1245, 1250 (3d Cir. 1985)), but "[t]he movant has a 'heavy burden' in meeting these requirements," *United States v. Saada*, 212 F.3d 210, 216 (3d Cir. 2000).

The only disputed requirement that remains in this case is whether Justiniano's testimony is of such substance and nature that it would probably produce an acquittal in a new trial.[10] Defendant argues that it probably would; the government disagrees, contending that Justiniano is not credible.  As discussed below, I find that Justiniano is credible and conclude that defendant has met his burden of establishing that Justiniano's testimony would probably produce an acquittal.

**B.      Frank Justiniano's Testimony Would Probably Produce an Acquittal**

**I.  Justiniano's Credibility**

At the heart of the issue is whether Justiniano is credible.  *See United States v. Bostic*, 360 F. Supp. 1305, 1309 (E.D. Pa. 1973) (concluding that "[t]he Court must first decide whether the evidence presented is credible").  The credibility of the testimony of a newly discovered witness is left to the court's broad discretion.  *United States v. Maddox*, 444 F.2d 148, 152 (2d Cir. 1971) (holding that, in the context of newly discovered testimony, "it is clear that the trial judge . . . has broad discretion in deciding whether the new evidence is credible").  Defendant contends that Justiniano's testimony was based on firsthand knowledge, consistent in all material ways with evidence presented at his trial, and delivered without probable bias or incredible demeanor.  The government counters that Justiniano's testimony conflicts with credible evidence and is inherently incredible and that Justiniano is unreliable because he lacked personal knowledge and is biased.

_____

[10] The government presently disputes only whether defendant has satisfied the fifth requirement.  (Gov't Mem. Opp. Def.'s Mot. New Trial 2.)

12

Defendant has the better of the argument.  Justiniano testified based on firsthand knowledge.  He described his personal involvement in events at issue and provided detailed descriptions of those events.  He testified thoroughly throughout the proceedings.[11]  His personal knowledge is substantiated by others' testimonies as well.  Kozlow testified to the fact that he drafted Justiniano's affidavit based on Justiniano's unprompted statements, and Justiniano hand-edited the typed affidavit.  (*E.g.*, *id.* at 218:18-16; 243:7-16.)  Furthermore, the court assured itself that Justiniano did not testify based on information learned from sources other than his own observations.  (*Id.* at 154:16-155:24.)

Justiniano's firsthand knowledge is bolstered by a reasonably high level of consistency between his testimony and the other evidence presented at trial, six years earlier.  He testified consistently with Officer Dove and with the physical evidence presented at trial with respect to the type of car (*compare* June 12 Tr. 34:22 (Dove: "a blue Mercury Cougar") *with* Nov. 1 Tr. 65:14 (Justiniano: "A blue Cougar")); type of gun (*compare* June 12 Tr. 36:22-23 (Dove: "a 22 caliber revolver") *with* Nov. 1 Tr. 64:16 (Justiniano: "a .22 revolver")); and drug type,

---

[11]  Some of the government's attempts to undermine his testimony are belied by the record and my recollection of the hearings.  For example, the government attempts to impeach Justiniano because, ostensibly, he did not mention that Mendez placed multiple calls to the police until re-direct examination.  (Gov't's Mem. Opp'n Def.'s Mot. New Trial 6.)  In fact, on direct examination, in response to the question "Were you present when Santos Mendez made the call?," he answered, "Not his first call, no"; and to the question, "Were you present when he made a call to the police?," he replied, "Yes, one of them."  (Nov. 1 Tr. 66:20-23.)  Justiniano did not conceal that Mendez placed multiple calls to the police when first addressing the issue in his testimony.  (*See also id.* at 242:16-25 (testimony of Kozlow explaining that he focused Justiniano's affidavit on "items that he had personal knowledge of").)  The fact that Justiniano testified to an anonymous call to the police by Mendez during the day does not contradict the fact that another anonymous call was made to the police at 11:29 p.m. that evening which prompted the radio report received by Officer Dove.

packaging, and amount (*compare* June 12 Tr. 36:25-37:6 (Dove: "a newspaper wrapped package" of "six, what we call bundles, each bundle contained 13 packets" of "[h]eroin") *with* Nov. 1 Tr. 64:16-65:6 (Justiniano: heroin, "wrapped up in newspaper, like, thirteen, fourteen bundles of it"); Justiniano Aff. ¶1 ("six bundles of heroin").[12]  In addition, Justiniano's testimony was substantially similar to that of Officer Dove regarding the location of the contraband in the car.  Officer Dove testified that he moved the back portion of the seat forward, leaned into the rear of the vehicle, looked under the front driver's seat from the rear, and found the revolver and the packet of heroin "towards the rear of the front seat."  (June 12 Tr. 36:21-23, 63:21-65:25.)  Justiniano testified that he placed the revolver and heroin "[b]ehind the driver's side in the back seat, the part that you sit at."  (Nov. 1 Tr. 66:5-6.)  He later clarified that he placed them "[i]n back of the driver's seat in the bottom."[13]  (*Id.* at 153:20-54:4.)  Although somewhat inconsistent as to the location, the court is satisfied that this could be the result of a faulty memory by Justiniano,[14] seven years after the fact, and not an intentional falsehood.  Even were I to find that his testimony was that he placed the gun and drugs under the rear seat, this would not cause me

---

[12]The government also points to the discrepancies in the description of the drugs; *i.e.*, 6 bundles, each with 12-13 packets according to Officer Dove.  Justiniano varied between saying there were 6 bundles in his affidavit and his testimony that there were 13-14 bundles of heroin, but there were 13-14 packets in each bundle.  I do not find that the discrepancy is significant and conclude that it is just a matter of a difference in vocabulary confusing packets and bundles.

[13]Justiniano likewise accepted the prosecutor's characterization that defendant could have reached under his seat and discovered the revolver and heroin (*see* Nov. 1 Tr. 100:7-10); and he noted, under the court's questioning, that the revolver and heroin would not have been visible if somebody looked into the car (*see id.* at 154:2-4).

[14]In fact, in a two-door coupe, it may well not be possible to put anything under the rear seat.

14

to find his testimony incredible, only sometimes inconsistent as a result of a faulty memory.

Justiniano's testimony as a whole is thus substantially consistent with the trial record in these

material aspects.[15]

The government argues at length that the setup was so ill conceived or out of character as

to be disbelieved.  Justiniano and others testified that Mendez typically resorted to violence, not

subterfuge, to punish individuals he believed were "gagging" his customers.  Justiniano also

admitted many facts suggesting that the plan had the potential to go awry.  Nonetheless, a poorly

planned setup does not necessarily undermine its actuality, and Justiniano consistently explained

the logic of the setup vis-á-vis Mendez's suggested alternative of killing defendant (to keep

Mendez from becoming responsible for and potentially prosecuted for another murder),

thoroughly described Mendez's and his efforts to carry out the plan, and admitted their concerns,

and at times lack thereof, during the events.  In addition, the testimonies of other witnesses fit

nicely into his narrative.  For example, Carrasquillo, the individual with whom defendant got into

an altercation on the night he was arrested, testified that he demanded defendant leave the street

corner because Mendez threatened defendant for "gagging."[16]  (Nov. 1 Tr. 110:14-117:16.)

Thus, the court finds that Justiniano's testimony regarding the setup was credible.

_____

[15]The government finds an inconsistency between the call Justiniano witnessed between noon and 3:00 p.m. and the later call, of which there is a CAD report, at 11:29 p.m.  However, the 11:29 p.m. call could have been made unknown to Justiniano by someone else within the Mendez organization or someone completely unrelated to the Mendez organization.  This fact does not undermine Justiniano's credibility.

[16]Rivera and Carasquillo corroborated Justiniano's testimony that Mendez thought Figueroa was gagging on the corner that Mendez controlled.

While the substance of Justiniano's testimony is evidence of his credibility, the tenuous nature of a claim of bias and his demeanor throughout the proceedings also dissuade the court from concluding that he lacked credibility. Justiniano was a friend of a friend of defendant's brother, but this tenuous connection does not undermine his testimony for the present motion, nor do the government's arguments that Figueroa was on easy terms with the Mendez drug organization.[17] Moreover, Justiniano has no significant motive to testify falsely. No benefit inures to him from his testimony and he has not been threatened into testifying or offered any payment in exchange for testifying. Based on my observations, I also find that Justiniano answered the questions posed to him directly, offered appropriate clarification, and did not evade questions that cast him in a negative light.

Justiniano is now protected by the statute of limitations from prosecution for his part in the planting of the gun and drugs. However, he is subject to possible prosecution for perjury or making a false statement by testifying now and only committed himself to his testimony after he had consulted with an attorney in New Jersey. The government argues that he could have given this information to the case agents when he was making his proffer after his arrest. This might

---

[17]The cases cited by the government require a much closer tie between the individuals to infer the existence of bias. *See United States v. Duke*, 255 F.3d 656, 659 (8th Cir. 2001) (finding incredible the exonerating testimony of the defendant's brother when that brother had already been convicted of the same crime); *United States v. Kamel*, 965 F.2d 484, 494-95 (7th Cir. 1992) (finding incredible an exonerating confession based on "brotherly loyalty," wherein the brother took "full blame for a crime for which he, as well as his brother, ha[d] already been convicted"); *United States v. Menard*, 939 F.2d 599, 600 (8th Cir. 1991) (finding incredible the exonerating affidavits of defendant's mother and sister when they contradicted the trial testimony of many witnesses); *United States v. Oliver*, 683 F.2d 224, 229 (7th Cir. 1982) (finding incredible an exonerating, informal letter by a friend of the defendant who spoke to the defendant after the crime but did not come forward to testify and be cross-examined). The court finds that the tenuous familiarity in this case has not resulted in the bias suggested by the government.

have been of benefit to him had he done so, but he testified he was more interested at that time in protecting Mendez and therefore answered only the questions which the agents asked and did not volunteer information.  Justiniano testified that he withheld the information from the case agents because he wanted to protect Santos Mendez.  He came forward with the information on March 8, 2006 after Mendez was sentenced to life imprisonment on December 13, 2005.  I conclude that Justiniano's testimony is credible.

## II.  Probability of Acquittal

The government's case rests on the defendant's constructive possession of the gun and drugs.  A showing of knowing constructive possession suffices to establish possession.  "A person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of it.  A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing. . . is then in constructive possession of it."  *United States v. Blackston*, 940 F.2d 877, 883 (3d Cir. 1991) (quoting Black's Law Dictionary 1047 (5th Ed. 1979); *accord Iafelice*, 978 F.2d at 97.  It is reasonable to believe that one who has substantial control over a vehicle tends to know what objects are in that vehicle and tends to have dominion and control over those objects.  *See Iafelice*, 978 F.2d at 97 (3d Cir. 1992) ("Common sense counsels that an owner and operator of a vehicle usually has dominion and control over the objects in his or her vehicle of which he or she is aware, and usually knows what is in that vehicle.").  Evidence of substantial control over a vehicle does not dispositively establish dominion and control over the objects in the vehicle.  Other evidence may undercut the significance of the control over the vehicle, and other evidence may also bolster the significance of the control over the vehicle.  *See id.*

The government presented no direct evidence that defendant knew of the contraband in the vehicle.  Defendant and his girlfriend, Lisa Wilson, testified that they did not know of the contraband in the vehicle.  The jury had to infer from the facts and circumstances of the case that defendant knew of, and intended to exercise dominion and control over, the contraband.  The newly discovered evidence is direct evidence that contradicts the inference reached by the jury

18

based on circumstantial evidence.  The newly discovered evidence puts the whole case in such a different light as to undermine confidence in the verdict.

Justiniano's testimony would probably produce an acquittal at trial.  Justiniano testified that he planted a .22-caliber revolver and newspaper-wrapped bundles of heroin in defendant's blue Mercury Cougar as part of a setup.  Because there was no direct evidence that defendant possessed the revolver and heroin, this testimony directly refutes the government's argument at trial that he constructively possessed them because they were under his seat in his car.  As such, Justiniano's testimony disproves a necessary element to defendant's conviction.  *See United States v. Jenkins*, 90 F.3d 814, 817-18 (3d Cir. 1996) (requiring evidence of "both 'dominion and control' over an object and knowledge of that object's existence" (internal quotation marks omitted) (quoting *United States v. Iafelice*, 978 F.2d 92, 96 (3d Cir. 1992)).

As a result, I find Justiniano's testimony is a sufficient basis on which to grant defendant's motion for a new trial.  Justiniano's testimony directly refutes an issue material to and necessary for defendant's conviction—his constructive possession of the revolver and heroin—and would probably produce an acquittal.  He testified from first-hand knowledge, in detail and with substantial similarity to the evidence presented at trial.  And, he testified without probable motivation to lie and with a sufficiently credible demeanor.  After considering all of the other evidence in the record, including the trial testimony, I conclude that Justiniano's testimony is of such substance, and of such a nature, that on a new trial, the newly discovered evidence would probably produce an acquittal.  Defendant argued at trial that there was a possibility that the gun and drugs had been planted in his vehicle as a result of the allegation of gagging, but he had little evidence to support the argument.  He now has direct evidence of a plant.  During the

19

new trial, the government is, of course, free to cross-examine Justiniano on the inconsistencies in testimony that it has raised and on his motivations to testify.  The jury will then judge his demeanor and decide if he is credible.  At a minimum, the jury is likely to have a reasonable doubt as to whether the defendant possessed the gun and drugs that led to his conviction and, therefore, I conclude that the newly discovery evidence will probably produce an acquittal.

**III.    CONCLUSION**

Defendant has met his heavy burden of establishing each of the five elements necessary for the court to grant him a new trial under Rule 33(b)(1).  As discussed in this memorandum, Justiniano's testimony was such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.  The court will therefore grant defendant's motion for a new trial under Rule 33.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 00-94 |
| DAVID FIGUEROA, | : | |
| Defendant. | : | |
| | : | |

## Order

AND NOW on this _____ day of December, 2008, upon careful consideration of defendant David Figueroa's motion for a new trial pursuant to Federal Rule of Criminal Procedure Rule 33 (Docket No. 56), defendant's memorandum of law in support of the motion, the government's response thereto, and defendant's reply and evidentiary hearing on November 1, 2007, the government's motion for reconsideration (Document No. 109), the defendant's response and after review of the trial transcript, IT IS HEREBY ORDERED that:

1.	The government's motion for reconsideration (Document No. 109) is GRANTED and the court's opinion dated July 30, 2008 is VACATED.

2.	On reconsideration, defendant's motion for a new trial is GRANTED.

3.	The case is listed for trial to commence on **January 20, 2009 at 10:00 a.m. in Courtroom 14-B, U.S. Courthouse, 601 Market Street, Philadelphia, PA**.


_____
s/William H. Yohn Jr.
William H. Yohn Jr., Judge